# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TOUCH-N-BUY LLC, *et al.*, | ) | Case No. 1:25-cv-605 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | James E. Grimes, Jr. |
| UNITED CONSUMER FINANCIAL | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

This case involves a contractual dispute between a provider of loans and its former independent sales representatives who did business through affiliated companies and promoted the provider as a preferred financer for consumer purchases.  Under the terms of the parties' contract, the representatives promoted the provider, and the provider compensated the representatives through commissions.  When the provider terminated the contract, Plaintiffs sued for unjust enrichment, fraudulent misrepresentation, breach of contract, promissory estoppel, and tortious interference with business expectancy.  Defendant moved to dismiss Plaintiffs' complaint.  For the reasons that follow, the Court **GRANTS** Defendant's motion.

## JURISDICTION

Plaintiffs are affiliated companies doing business under the Touch-N-Buy brand.  Touch-N-Buy, LLC is registered in North Carolina (ECF No. 1, ¶ 2, ECF

No. 4), and its members are citizens of North Carolina (ECF No. 26, PageID #69). Touch-N-Buy, LP, and Touch-N-Buy-MI, LLC, are registered in Michigan.  (ECF No. 1, ¶¶ 3–4, PageID #4.)  Its members are citizens of Michigan and North Carolina. (ECF No. 27, PageID #71; ECF No. 28, PageID #73.)  Defendant United Consumer Financial Services is a corporation incorporated in Delaware with its principal place of business in Ohio.  (ECF No. 1, ¶ 5, PageID #19.)  Among other relief, Plaintiffs seek damages in excess of $75,000.  (*Id.*, ¶ 9; *see also* ECF No. 30, ¶ 9, PageID #78.) Therefore, the Court has subject jurisdiction under 28 U.S.C. § 1332.

## STATEMENT OF FACTS

On Defendants' motion to dismiss, the complaint alleges the following facts, which the Court accepts as true and construes in the light most favorable to Plaintiffs, as it must in the present procedural posture.

On July 25, 2017, Touch-N-Buy and United Consumer Financial Services entered into a confidentiality, nondisclosure, and use agreement "to evaluate a possible business relationship."  (ECF No. 1, PageID #39.)  This agreement remained in effect for three years from its effective date—until July 25, 2020.  (*Id.*, ¶ 6, PageID #40.)  On August 18, 2017, the parties entered into an independent representative agreement.  (*Id.*, PageID #19.)  This contract and its related schedules constitute the entire commercial agreement between the parties.  (*Id.*, ¶ 16, PageID #25.)

### A.    The Independent Representative Agreement

Under the contract, United Consumer Financial Services "appoint[ed Touch-N-Buy] as its independent representative to solicit merchants to enter into Merchant

Agreements and to promote [United Consumer Financial Services], as one of the preferred financiers for consumer purchases, within the geographical area defined." (*Id.*, PageID #19.)  Further, the contract specifies that Touch-N-Buy was a "non-exclusive representative" and an "independent contractor" for United Consumer Financial Services.  (*Id.*, ¶¶ 2 & 17, PageID #20 & #25.)

Schedule A of the contract defines the geographic area as the "Continental United States" and the marketed products as sheds and outdoor structures, roofing materials, plumbing products, and "[o]thers as agreed to by parties."  (*Id.*, PageID #30.)  United Consumer Financial Services agreed to pay Touch-N-Buy a 2% commission on new merchant contracts that Touch-N-Buy "generated," subject to minimum new contract volumes.  (*Id.*, PageID #32.)  This commission represents the only compensation that United Consumer Financial Services owed Touch-N-Buy under the contract.  (*Id.*, ¶ 6.A, PageID #21.)  On August 27, 2020, the parties amended the volume minimums and certain details of the commission structure but not the percentage for the commission.  (*Id.*, PageID #43.)  No other modifications appear in the record.

Either party had the right to terminate the contract "at any time . . ., for convenience, upon ninety (90) days prior written notice."  (*Id.*, ¶ 14, PageID #24.)  In the event of termination, commissions "continue for all contracts accepted prior to termination."  (*Id.*)  On notice of termination and after Touch-N-Buy performed all remaining contractual obligations, United Consumer Financial Services would "make final payment of commission to [Touch-N-Buy.]"  (*Id.*, ¶ 13, PageID #24.)  Under the

agreement, termination does not make United Consumer Financial Services liable to Touch-N-Buy for "damages on account of the loss of prospective profits" or "any expenditure, investment[,] or obligation incurred or made by [Touch-N-Buy.]" (*Id.*) Additionally, the contract's section titled Compensation specifies that, if termination occurs, Touch-N-Buy "shall be entitled to applicable commissions . . . on all accepted Merchants' contracts, prior to the effective date of termination." (*Id.*, ¶ 6.F, PageID #21.)

Among other things, the contract allowed United Consumer Financial Services "to change or modify" merchant agreements and sales contracts that Touch-N-Buy solicited; "to discontinue or delete" those agreements; "to add new and additional [p]roducts"; and "to adjust or change any term, rate, or condition on or related to [the] Agreements." (*Id.*, ¶ 3, PageID #20.) Although the contract required United Consumer Financial Services to notify Touch-N-Buy of these changes, "such written notice shall not be a prerequisite to the effectiveness of the change." (*Id.*)

## B.      Termination of the Contract

Touch-N-Buy alleges that it, "at all times relevant, dutifully complied with its obligations pursuant to the [contract]" and that the merchants "it provided to [United Consumer Financial Services] originated a large dollar volume of loans for [United Consumer Financial Services] in excess of $100,000,000.00, at APRs averaging near 20% interest." (*Id.*, ¶¶ 13 & 16, PageID #4–5.) However, on February 26, 2024, United Consumer Financial Services sent a letter to Touch-N-Buy stating that it was "terminating the [contract] for convenience and without cause, effective 90 days from

4

the date of [the] letter." (*Id.*, PageID #37.)  The complaint alleges that United Consumer Financial Services stated elsewhere that it "didn't get enough value from the relationship." (*Id.*, ¶ 15, PageID #5.)  The letter indicated that "[f]inal payment [would] be made to [Touch-N-Buy] upon complying with all remaining obligations." (*Id.*, PageID #37.)  The complaint does not specify whether United Consumer Financial Services made a final payment.

Touch-N-Buy alleges that, after termination, United Consumer Financial Services "continues to buy new contracts" from merchants that Touch-N-Buy solicited, without compensating Touch-N-Buy, "[d]espite . . . assurances and promises" to the contrary.  (*Id.*, ¶¶ 18 & 21, PageID #5–6.)  Additionally, United Consumer Financial Services modified its agreements with the solicited merchants "without notifying [Touch-N-Buy] as expressly agreed." (*Id.*, ¶ 18, PageID #5.)

According to the complaint, Touch-N-Buy and United Consumer Financial Services attempted, but ultimately failed, to "renegotiate a new agreement." (*Id.*, ¶ 23, PageID #6.)  Specifically, Touch-N-Buy represents that it "offered a 3% first year, 1% second year, and .25% third year agreement for commissions, without Evergreen commissions from new merchant sellers." (*Id.*, ¶ 24, PageID #6.)

### C.  Other Alleged Harms

In addition, Plaintiff alleges that Defendant harmed it in various ways during and after the contractual period.

First, the complaint avers that United Consumer Financial Services "conducted business contrary to [its] promises and ordinary course of business." (*Id.*,

¶ 25, PageID #6.)  Specifically, United Consumer Financial Services allegedly did not pay Touch-N-Buy for new business with "spin-off" companies of provided merchants and "refused to account for referrals, when in reality it was [Touch-N-Buy] that provided the merchant in the first place." (*Id.*)  Likewise, United Consumer Financial Services did not compensate Touch-N-Buy for "introduc[ing United Consumer Financial Services] to numerous other lending partners and/or platforms . . . as agreed upon." (*Id.*, ¶ 26, PageID #7.)  The complaint does not specify which contract provisions these alleged actions violated.

Second, the complaint alleges that United Consumer Financial Services "discontinued its weekly reporting" of sales volumes "despite an obligation to do so," which "veil[ed] exactly the amount of commissions due and owing to [Touch-N-Buy]." (*Id.*, ¶ 28, PageID #7.)  Further, United Consumer Financial Services "withheld reports despite written request, making it impossible for [Touch-N-Buy] and its [a]gents to assist merchants." (*Id.*, ¶ 29, PageID #7.)  And United Consumer Financial Services allegedly changed both "credit criteria"—which "mad[e] it impossible to assist merchants to grow their volume"—and "the process for adding merchants"—which required Touch-N-Buy to disclose merchant information and "circumvent[ed Touch-N-Buy's] ability to collect a commission." (*Id.*, ¶¶ 31–33, PageID #7.)  The complaint does not specify which contract provisions are relevant to this issue.

Third, the complaint alleges that United Consumer Financial Services "made representations that [Touch-N-Buy] would be the sole [i]ndependent representative"

in both "the 'timeshare exit' and 'tax remediation' industries for [United Consumer Financial Services'] financing solutions."  (*Id.*, ¶ 34, PageID #7–8.)  Based on these representations, Touch-N-Buy allegedly "spent well over $1,000,000.00, and a considerable amount of time" in promoting Defendant's products.  (*Id.*, ¶ 35, PageID #8.)  Following termination, Touch-N-Buy alleges that it has lost, and continues to lose, "revenue in excess of $55,000.00 per month" in these areas of financing.  (*Id.*, ¶ 37, PageID #8.)

Finally, Touch-N-Buy alleges that it "is experiencing business disruption and loss of agents" as a result of "[United Consumer Financial Services'] conduct."  (*Id.*, ¶ 38, PageID #8.)  For example, the complaint alleges that United Consumer Financial Services contacted one of Touch-N-Buy's exclusive agents for services, which "substantially tarnished and interfered with [Touch-N-Buy's] contractual relationship" with that agent "and caused ill will and animosity between the parties." (*Id.*, ¶¶ 39–41, PageID #8.)  As another example, "[Touch-N-Buy's] agents no longer want to do business with [Touch-N-Buy] in the field of Tax Remediation."  (*Id.*, ¶ 41, PageID #8.)

## STATEMENT OF THE CASE

On June 26, 2024, Plaintiffs brought claims against Defendant for unjust enrichment, fraudulent misrepresentation, breach of contract, promissory estoppel, and tortious interference with business expectancy.  (ECF No. 1.)  Plaintiffs seeks damages, a declaratory judgment, and an accounting.  (*Id.*, ¶¶ 42–88, PageID #8–15.) On March 27, 2025, the case was transferred to the Northern District of Ohio from

the Eastern District of Michigan.  Defendant moves to dismiss on all counts.  (ECF No. 22.)

## LEGAL STANDARD

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim.  *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability."  *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor.  *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).  But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading

as factual allegations[.]"  *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be.  *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'").  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.

### ANALYSIS

In its motion to dismiss, Defendant represents that the complaint included a "fictitious" quotation that purported to be from the contract.  (ECF No. 22, PageID #40.)  Specifically, the complaint alleges that the contract contains the following sentence: "All payment on merchant contracts brought by [Touch-N-Buy] are to continue, surviving termination."  (ECF No. 1, ¶ 22, PageID #6.)  Defendant notes—correctly—that this sentence does not in fat appear anywhere in the contract attached to the complaint.  (*See generally* ECF No. 1, PageID #18–35.)

In opposing dismissal, Plaintiffs do not repeat this misquotation.  Instead, they maintain that the substance of their misquotation is "essentially" reflected in a particular provision of the contract.  (ECF No. 31, PageID #90.)  That provision states

that "[c]ommissions will continue for all contracts accepted prior to termination." (ECF No. 1, ¶ 14, PageID #24.)

"When a written instrument contradicts allegations in the complaint to which the written instrument is attached, the exhibit trumps the allegations." *Luckey Farmers, Inc. v. Fergus Farms, LLC*, 717 F. Supp. 3d 676, 686–87 (N.D. Ohio 2024) (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)) (cleaned up).  Therefore, the contract's actual language will guide the Court's analysis—not any party's characterization of it.  Because the attached contract—which the parties agree governed their commercial relationship—contains an Ohio choice-of-law provision (*see* ECF No. 22, PageID #43 & n.2; ECF No. 1, PageID #27), the Court adjudicates Plaintiffs' claims under Ohio law.

## I.      Breach of Contract

Count Three of the complaint brings a claim for breach of contract.  Plaintiffs claim that Defendant breached the contract between the parties by repudiating the contract before performance was due—that is, by taking the benefit of the contract before payment was due to Touch-N-Buy.  (ECF No. 1, ¶¶ 58–63, PageID #10–11.) Specifically, Plaintiffs contend that United Consumer Financial Services breached the contract's provision that "[c]ommissions will continue for all contracts accepted prior to termination."  (*Id.*, ¶ 14, PageID #24.)  They argue that this provision "essentially states that all payment on merchant contracts brought by Touch-N-Buy are to continue, surviving termination."  (ECF No. 31, PageID #90.)

Defendant argues that the contract "does not say that—essentially or otherwise." (ECF No. 32, PageID #134.) Instead, it contends that this provision means that compensation will continue during the ninety-day period between notice of termination and the effective date of termination. (*Id.*) On this reading, Defendant argues that its non-payment of commissions following contract termination did not breach the contract. (*Id.*) Accordingly, Defendant moves to dismiss Plaintiffs' breach of contract claim. (*Id.*)

### I.A.    Contract Interpretation

When interpreting a contract, "[t]he Court's primary objective is to 'ascertain the intent of the parties.'" *Sharqawi v. Kirby Co.*, 675 F. Supp. 3d 798, 812–13 (N.D. Ohio 2023) (quoting *Saint Marys v. Auglaize Cnty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 18). Under Ohio law, "intent is evidenced by the contractual language," not a party's unexpressed opinions. *Bay Shore Power Co. v. Oxbow Energy Sols., LLC*, 969 F.3d 660, 665 (6th Cir. 2020). A contract is not necessarily "ambiguous simply because parties disagree about its meaning." *Tattletale Portable Alarm Sys., Inc. v. MAF Prods., Inc.*, No. 2:14-cv-00574, 2016 WL 5122545, at *6 (S.D. Ohio Sept. 21, 2016) (citing *Shifrin v. Forest City Enters., Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28, 597 N.E.2d 499). When interpreting potentially ambiguous provisions, courts "stick to the four corners of the agreement, construe the contract as a whole, and give reasonable effect to every provision in the agreement." *Sharqawi*, 675 F. Supp. 3d at 813; *see also Equity Plan. Corp. v. Westfield Ins. Co.*, 522 F. Supp. 3d 308, 316 (N.D. Ohio 2021), *aff'd*, 2022 WL

11

17832176 (6th Cir. Dec. 21, 2022) (recognizing that "in construing a contract, a court must read and consider the provisions as a whole and not in isolation").

Here, the applicable contract provision allows either party to terminate the agreement with 90-days written notice: "This Agreement may be terminated at any time by either party, for convenience, upon ninety (90) days prior written notice given by registered mail addressed to the other party . . . ." (ECF No. 1, ¶ 14, PageID #24.) That provision concludes: "Commissions will continue for all contracts accepted prior to termination of this Agreement." (*Id.*) United Consumer Financial Services invoked this provision on February 26, 2024 (*id.*, PageID #37), making the date of the contract's termination Sunday, May 26, 2024.

### I.B.  The Independent Representative Agreement

To the extent this provision contains any ambiguity or is susceptible of competing interpretations, other provisions of the contract point to its meaning as a whole.  First, the contract's "Compensation" section specifies that, in the event of termination, Touch-N-Buy "shall be entitled to applicable commissions . . . on all accepted Merchants' contracts, prior to the effective date of termination." (ECF No. 1, ¶ 6.F, PageID #21.)  Grammatically, "a dependent clause must modify . . . the main clause." *Bryan Chamber of Com. v. Board of Tax Appeals*, 5 Ohio App. 2d 195, 200, 214 N.E.2d 812, 815 (Ohio Ct. App. 1966).  Therefore, the dependent clause "prior to the effective date of termination" is best read as modifying the preceding main clause concerning commissions payments.  (ECF No. 1, ¶ 6.F, PageID #21.)  That is, Touch-N-Buy is entitled to commissions on accepted contracts prior to termination, but not

12

after.  Accordingly, the plain meaning of this provision demonstrates that all commission payments come before, rather than after, the effective date of termination.

Another provision specifies that, "[u]pon termination for any reason," United Consumer Financial Services "shall make final payment of commission to [Touch-N-Buy]" after Touch-N-Buy performs all remaining contractual "obligations."  (*Id.*, ¶ 13, PageID #24.)  This provision illustrative two points that bear on the meaning of the disputed provision of the contract.  First, the word "final" immediately preceding the phrase "payment of commission" indicates that commission payments cease after one last payment.  (*Id.*)  Second, the singular, rather than plural, form of the word "payment" suggests the same interpretation.  (*Id.*)  This language elsewhere in the contract reinforces the plain meaning of the disputed provision that payment of commissions does not continue post-termination.

### I.C.    Payment of Commissions Post-Termination

"Under Ohio law, contract interpretation, including a determination as to whether a contract is ambiguous, is a question of law."  *In re Fifth Third Early Access Cash Advance Litig.,* 925 F.3d 265, 276 (6th Cir. 2019) (citing *Envision Waste Servs., LLC v. City of Medina*, 2017-Ohio-351, 83 N.E.3d 270, ¶ 15 (Ohio Ct. App. 2017)).  "When interpreting a contract, [courts] will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary."  *Bay Shore Power Co.*, 969 F.3d at 666 (citations omitted).  "Ohio law

instructs courts to attempt to reconcile inconsistent contract terms and give effect to each term." *Id.* (quotations omitted).

Plaintiffs and Defendant posit mutually exclusive, competing interpretations: either commission payments continue post-termination or they do not. Plaintiffs contend that payments should continue after termination. But this argument invalidates the plain reading of at least two other provisions of the contract. Meanwhile, Defendant's position that commission payments do not survive termination largely aligns with the plain language of these other provisions. Further, no other provision supports Plaintiffs' interpretation. Accordingly, Defendant's interpretation of the provision gives effect to each term of the contract, while Plaintiffs' does not.

Because only one reasonable interpretation of the provision at issue gives effect to each provision of the contract as a whole, the contract is not ambiguous as a matter of law. Even accepting all of Plaintiffs' factual allegations as true, Defendant's non-payment following termination did not breach the contract.

\*     \*     \*

As a final matter, the Court notes that there is one paragraph of the complaint alleging that Defendant "violated a confidentiality agreement" between the parties. (ECF No. 1, ¶ 19, PageID #6.) Apart from that conclusory assertion, the complaint provides no other allegations or explanation how United Consumer Financial Services did so or which provision of the confidentiality agreement it allegedly violated. Further, the confidentiality agreement attached to the complaint expired

by its own terms on July 25, 2020 (*id.*, ¶ 6, PageID #40), years before the conduct at issue in 2024 (*id.*, ¶ 18, PageID #5). Accordingly, whatever independent claim Plaintiffs meant to assert based on the confidentiality agreement is not sufficiently pled to withstand dismissal.

For these reasons, the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' breach of contract claim.

## II. Unjust Enrichment and Promissory Estoppel

Count One of the complaint brings a claim for unjust enrichment based on Defendant's refusal to continue commission payments after termination. (ECF No. 1, ¶¶ 42–49, PageID #8–9.) Count Four brings a claim for promissory estoppel on the same basis, alleging that Defendant promised Plaintiffs that it would compensate them for their work. (*Id.*, ¶¶ 64–68, PageID #11–12.)

Unjust enrichment and promissory estoppel claims are inconsistent with the existence of an express written contract. "Under Ohio law, a plaintiff may not recover under the theory of unjust enrichment . . . when an express contract covers the same subject." *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 858 (6th Cir. 2020) (quotation omitted). Likewise, "the existence of an enforceable express contract between the parties bars recovery under a promissory estoppel claim." *Gurary v. John Carroll Univ.*, 2024-Ohio-3114, ¶ 42, 251 N.E.3d 271 (Ohio Ct. App.) (quoting *12100 Buckeye Ltd. v. Council for Econ. Opportunities in Greater Cleveland*, 2021-Ohio-4517, ¶ 29 (Ohio Ct. App.)) (collecting cases).

Here, the parties do not dispute the existence of an express contract governing their commercial relationship.  Plaintiffs acknowledge that these claims are alternative theories that might apply only if the Court determines "that there was no valid contract between the parties or that Plaintiffs otherwise may not pursue their claims under a breach of contract theory."  (ECF No. 31, PageID #97 & #98.)  Because the parties have a valid contract, it governs their relationship and provides the rights and remedies available to each.  Accordingly, the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' claims for unjust enrichment and promissory estoppel.

### III.    Fraudulent Misrepresentation

Count Two of the complaint brings a claim for fraudulent misrepresentation based on Defendant's alleged "misrepresentations regarding its willfulness [*sic*] and intentions to carry out its obligations to further the parties' business interest, which was clearly designed to procure additional Merchants and utilize them for their own business interests without remitting any funds to Plaintiffs for services done to procure the Merchants."  (ECF No. 1, ¶ 55, PageID #10.)  Plaintiffs do not specifically identify the alleged misrepresentations that support this count, only generally referring to Defendant "knowingly and intentionally misrepresent[ing] numerous actions in the scope of Plaintiff[s'] work with Defendant, as laid out [in prior paragraphs of the complaint]."  (*Id.*, ¶ 52, PageID #9–10.)  Defendant contends that the complaint does not satisfy Rule 9(b)'s heightened pleading requirements for fraud claims.

Rule 9(b) requires a complaint to state the "who, what, when, where, and how" of an alleged fraud, mistake, or omission.  *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quoting *Sanderson v. HCA—The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).  More specifically, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, [] (4) explain why the statements were fraudulent," and (5) "describe the fraudulent scheme and the resulting injury." *Id.* at 614–15 (quoting *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 411 (6th Cir. 2022)).  The purpose of these requirements is to "put defendants on notice as to the nature of the claim."  *Id.* at 615 (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).

In opposing dismissal, Plaintiffs identify the following statements as allegedly fraudulent:

(1) "[A]ssurances and promises that Plaintiffs would be compensated for as long as the merchants provided by them were originating new consumer agreements that were accepted by Defendant";

(2) Representations that Defendant would "renegotiate a new agreement" and that it "do[es] not see the economics of doing business as it stands";

(3) Failure "to notify Zip-Loan of new 'spin-off' companies belonging to [merchants] provided by Plaintiff";

(4) "[N]umerous promises to Plaintiffs to provide weekly reports";

(5) Statements that a "merchant must have called [Defendant] from their website" after Defendant contacted merchants directly; and

(6) "[R]epresentations that Plaintiff would be the sole Independent Representative in new areas Plaintiffs introduced Defendant to."

17

(ECF No. 31, PageID #99–100).  Also, Plaintiffs list "refus[al] to account for referrals" but do not provide any particular statements related to that conduct.  (*Id.*, PageID #99.)

The complaint does not state where or when any of these statements were made.  (*See* ECF No. 1, ¶¶ 21, 23, 25, 28–30, 32 & 34, PageID #6–8.)  For several of the statements, the complaint does not explain why it is false or misleading.  The first statement appears to be based on the same misunderstanding of Defendant's contractual obligations addressed above.  The latter half of the second is simply a statement of opinion, while no facts alleged in the complaint contradict the balance of it—the complaint does not allege that Defendant did not renegotiate.  To the contrary, it expressly alleges that Touch-N-Buy and United Consumer Financial Services attempted to negotiate a new agreement but were unable to do so.  (*Id.*, ¶ 23, PageID #6.)  Nor does it explain what injury resulted from Defendant's promise to renegotiate.  Similarly, the complaint does not provide any facts contradicting the sixth statement—it does not allege that Defendant retained another independent representative.

Because Plaintiff's claim for fraud fails to satisfy Rule 9(b), the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' claim for fraudulent misrepresentation.

## IV.    Tortious Interference with Business Expectancy

Count Five of the complaint brings a claim for tortious interference with business expectancy based on Defendant's "contact with various agents and vendors

of Plaintiffs for the sole and express purpose of disrupting Plaintiffs' ongoing relationships and business dealings." (ECF No. 1, ¶ 74, PageID #13.)  Plaintiffs make clear that their claim in Count Five is "based on Section 14 of the Agreement"—the same termination provision providing the basis for the breach of contract claim discussed above. (ECF No. 31, PageID #93.)

As a preliminary matter, Ohio courts "use the term 'tortious interference with a business expectancy' and the term 'tortious interference with a business relationship' interchangeably." *Coventry Grp., Inc. v. Gottlieb*, 2014-Ohio-213, ¶ 13, 7 N.E.3d 611 (Ohio Ct. App.). "Ohio does not recognize the tort of wrongful interference with a business expectancy that is separate from tortious interference with a business relationship." *Id.* (citing *EJS Props., LLC v. City of Toledo*, 651 F. Supp. 2d 743, 747 n.1 (N.D. Ohio 2009)).

"Tortious interference with a business relationship 'occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another.'" *Id.* (quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 1995-Ohio-66,651 N.E.2d 1283). To state a claim, a plaintiff must plead: (1) a contractual or business relationship; (2) the tortfeasor's knowledge of the relationship; (3) "an intentional and improper act by the tortfeasor preventing formation of a contract, procuring breach of a contract, or termination of a business relationship"; (4) the absence of a privilege on the part of the tortfeasor; and (5) resulting damage. *Grubb & Assocs. LPA v. Brown*, 2018-Ohio-3526, ¶ 16, 119 N.E.3d

19

836 (Ohio Ct. App.) (quoting *Bindra v. Fuenning*, 2013-Ohio-5722, ¶ 14 (Ohio Ct. App.)).

At bottom, because Plaintiffs premise this claim on the same allegations forming the basis for their breach of contract claim, it also fails as a matter of law. The parties' agreement allowed each party to terminate the contract, for convenience, with 90 days' notice.  Its termination cannot satisfy the elements of tortious interference.

Beyond that, the complaint references "contact with various agents and vendors" seems to allude to three categories of alleged conduct.  First, the complaint alleges that "Plaintiff[s'] agents no longer want to do business with" Plaintiffs in certain fields "because of Defendant's breach."  (ECF No. 1, ¶ 41, PageID #8.)  Second, Defendant allegedly contacted "for services" agents with whom "Plaintiffs held an exclusive contract."  (*Id.*, ¶ 39, PageID #8.)  Third, Defendant allegedly took deliberate action to undermine Plaintiffs' relationships with the merchants they referred to Plaintiffs.  (*Id.*, ¶¶ 27 & 31–33, PageID #7.)  The first two categories relate to Plaintiffs' business relationships with its agents.  For these, the complaint contains little more than "bald assertion[s] that [D]efendant tortiously interfered with th[ese] relationships[s] and caused [the agents] to case to conduct business with [Plaintiffs]." *Grubb*, 2018-Ohio-3526, ¶ 18.  Plaintiffs do not state whether Defendant knew of the exclusive contracts between Plaintiffs and their agents, explain why exercising the contractual right to terminate constituted an improper act, or establish that Defendant lacked justification for soliciting services from those agents.

As for the third category of allegedly tortious conduct, the complaint provides more detail.  Plaintiffs allege that United Consumer Financial Services interfered with its referral relationships with merchants by changing its criteria for applicants and merchants without informing Plaintiffs, "making it impossible [for Plaintiffs] to assist merchants."  (ECF No. 1, ¶ 31, PageID #7.)  Additionally, Defendant required Plaintiffs to disclose merchant information in exchange for a "special 'rate quote'." (*Id.*, ¶ 32, PageID #7.)  Then, Defendant "would contact the merchant with better terms later, circumventing Plaintiff[s'] ability to collect a commission."  (*Id.*) Defendant attempted to conceal this conduct from Plaintiffs by claiming that merchants were contacting Defendant directly from its website.  (*Id.*, ¶ 33, PageID #7.)

Although less conclusory, these allegations still fail to plead the elements for tortious interference with business relations.  In particular, the complaint "does not identify any specific business relationships with which [Defendant] interfered."  *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 559 (N.D. Ohio 2021).  Instead, it refers only to unspecified "merchants."  "A vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim."  *Id.* (quotation omitted); *see also MTD Prods. Inc. v. American Honda Motor Co., Inc.*, 627 F. Supp. 3d 867, 884 (N.D. Ohio 2022) (dismissing a claim based on the defendant's alleged interference with the plaintiff's relationships with "its customers").

Even taking the factual allegations of the complaint as true, it fails to state a claim for tortious interference with business expectancy.   Therefore, the Court **GRANTS** Defendant's motion to dismiss Count Five.

## V.      Declaratory Judgment and Accounting

In Count Six of the complaint, Plaintiffs request a declaratory judgment that Defendant ought to continue payment of commissions following contract termination. (ECF No. 1, ¶¶ 78–83, PageID #13–14.)   Because the Court determines that Defendant did not breach the contract regarding post-termination commissions payments, Plaintiffs are not entitled to the declaration they seek, and the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' request for a declaratory judgment.

In Count Seven, Plaintiffs request "an injunctive order mandating that Defendant[] provide[s] Plaintiffs with financial statements of the merchants, programs, and subsidiaries, as well as documentation of which Plaintiffs are currently being obstructed from accessing." (*Id.*, ¶ 88, PageID #15.) Accounting is an equitable remedy.  *Fetters v. Duff*, 2018-Ohio-542, ¶ 14, 107 N.E.3d 627 (Ohio Ct. App.).  Because each of Plaintiffs' claims fails as a matter of law, the Court has no occasion to consider a remedy.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss (ECF No. 22) and **DISMISSES** the complaint.

**SO ORDERED.**

Dated:  September 8, 2025

_____
       J. Philip Calabrese
       United States District Judge
       Northern District of Ohio